IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

JOSE LUIS GONZALEZ,                    *
                                       *
            Plaintiff,                 *
                                       *
vs.                                    *          2:05cv00269 SWW-JJV
                                       *
                                       *
                                       *
UNITED STATES OF AMERICA;              *
J. JIMINEZ, Health Service Administrator, *
FCI-Forrest City; G. TOLIVER, R.N., FCI- *
Forrest City; J. EDNA PRINCE, Clinical *
Director, FCI-Forrest City; YVETTE     *
TORO, an employee with the Federal     *
Bureau of Prisons; and UNITED STATES   *
BUREAU OF PRISONS,                     *
                                       *
            Defendants.                *

MEMORANDUM AND ORDER

Plaintiff Jose Luis Gonzalez, a Mexican national who was incarcerated at the Federal

Correctional Institute (FCI) at Forrest City, Arkansas for drug-trafficking convictions, brings this

action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403

U.S. 388 (1971) (*Bivens*), and the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 *et seq.*,

seeking damages resulting from the delay in treatment of a fractured ankle and leg he suffered

during his incarceration.  On February 2, 2010, Magistrate Judge Joe J. Volpe entered Proposed

Findings and Recommendations [doc.#136] in which he recommended that defendants' motion

for summary judgment on Plaintiff's *Bivens* claim be granted but that summary judgment on

Plaintiff's FTCA claim be denied.  By Order entered February 23, 2010 [doc.#150], the Court

adopted Judge Volpe's Proposed Findings and Recommendations, thereby allowing Plaintiff's

FTCA claim – the sole remaining claim in this action – to proceed to trial.[1]  Plaintiff's FTCA

claim was tried to the Court on August 30-31, 2010.[2]  This Memorandum and Order constitutes

the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of

Civil Procedure.

I.

Plaintiff arrived at FCI Forrest City, Arkansas on January 12, 2004.  Upon his arrival,

Plaintiff was diagnosed with diabetes and he was also treated for varicose veins and related

ulcers in his left lower leg.  During the relevant time period, Dr. J. Edna Prince was the Clinical

Director for the prison's Health Services Department.

On the evening of July 28, 2004, Plaintiff was playing second base in a sanctioned

softball game at the prison when he suffered a serious injury to his left ankle and lower left leg

due to another player sliding into second base and hitting him.  According to Plaintiff's expert

witness, Dr. James Keever, a licensed orthopedic surgeon, and not disputed by the United States,

Plaintiff suffered a pronation and lateral rotation injury to the ankle with an avulsion type

fracture of the medial malleolus and a fracture of the fibula proximal to the syndesmosis.  *See*

Keever Aff. at ¶ 11; Keever Supp. Aff. at ¶ 6.  It is not clear, however, that Plaintiff reported

feeling pain or requested medical attention immediately following his injury.  Rather, Plaintiff

states that after being hit by the other player, "[t]he guard comes over and asks me if I'm okay.  I

---

[1] Other claims and defendants were previously dismissed.  As Plaintiff's FTCA claim is now the sole remaining claim, the only proper defendant is the United States.  *Carter v. Ringwood*, No. 2:09CV00065 SWW, 2010 WL 796998 at *2 (E.D.Ark. March 8, 2010) (citing 28 U.S.C. § 1346(b)(1)).

[2] Before trial could commence, Plaintiff completed his sentence and authorities repatriated him to Mexico.  Because of his criminal conviction, Plaintiff was unable to obtain a visa to return to the United States for trial and he accordingly appeared by video deposition, the Court having granted Plaintiff's unopposed motion [doc.#166] for leave to so appear.

2

reply I don't know.  I'm lying on the ground.  The manager and the guard check me and I'm taken out of the game.  He sits me on the team's bench.  The game is over and we go back to our homes or our units."  Dr. Keever notes that while ankle fractures are "really a very, very painful fracture," and that there is "the initial pain of the broken bone," this pain "interestingly often doesn't play in a patient's memory that much."  He states that "afterwards, particularly with any movement where the bone fragments move back and forth, there is pain that would be on the way top end of the scale."  Dr. Keever states that Plaintiff would have had two pain zones as a result of his injury – pain near the knee where one break was located and pain in the ankle where the other break was located.[3]

While the record may not reveal that the severity of Plaintiff's injury was immediately apparent the night of July 28, 2004 or that Plaintiff requested medical attention at that time, the United States does not dispute that at approximately 8:00 a.m. on July 29, 2004, the day following his injury, Plaintiff self-reported to the Health Services Department for medical care and treatment of his ankle and leg.  Plaintiff states he was assisted by fellow prisoners up to the door of the Health Services Department and then used the wall for support the rest of the way.  Plaintiff, however, states he was told by G. Toliver, a nurse for the Health Services Department, that "walk-ins" were not allowed and that he was turned away and instructed to return the following day, July 30, 2004, at 6:30 a.m. during the Health Services Department's sick-call hours.

Plaintiff states that as instructed, he returned to the Health Services Department the next

---

[3] At the time of his injury, Plaintiff was on convalescence from July 16, 2004 to August 16, 2004.  Additionally, Plaintiff had restrictions of no prolonged standing and a weight restriction of no lifting over 15 pounds indefinitely beginning February 9, 2004.  Dr. Keever notes, however, that "there is absolutely nothing that would casually connect [his] condition [varicosities and varicose ulcers] to a traumatic fracture of the ankle."  Keever Aff. at ¶ 10.

morning on July 30, 2004, during sick-call hours.  Plaintiff, however, states he was told by Toliver that he could not be treated until the following week and must make an appointment for the next clinic day, August 2, 2004.  Plaintiff states he told Toliver that "it's an emergency, that it's a probable fracture," and that he asked Toliver to "send me to x-rays," but that Toliver "tells me to go and says, next."

On August 3, 2004, Plaintiff returned to the Health Services Department and was examined by Yvette Toro, a Physician's Assistant for the Health Services Department who is also fluent in Spanish.[4]  Toro reported in her note of this visit that Plaintiff complained of pain in his left ankle "due to sports injury," assessed the pain level at "6" – noting that the "pain is worse at night" – and noted edema, some marked discoloration and skin erosion, that dorsal flexion is slightly limited, and referenced dermatitis and arthralgia.  Toro further reported that Plaintiff ambulates with no difficulty.  Plaintiff, however, states that Toro could not have made such a determination as she did not see him enter or depart her presence, stating that Toro "couldn't say whether I walked or I didn't walk.  She didn't – she couldn't see me."  He states that Toro "has a room and you only take two steps and you sit on the chair in front of her.  You get out through that door and she cannot see you anymore."[5]  Plaintiff states he was never able to get to the Health Services Department without assistance, be it a wheelchair that he was able to procure himself or assistance from fellow inmates, and that he would otherwise have to hop

---

[4] The note of this visit apparently originally reflected a date of August 2, 2004 as the date of the visit but the note appears to have been altered, or "overwritten" as stated by Plaintiff, to reflect August 3, 2004 as the date of the visit.  Because the correct date is of no real import for purposes of today's decision, the Court will assume that the date of Plaintiff's visit was August 3, 2004.

[5] Dr. Prince stated that Toro's desk "[u]sually" was closer to the door and that Plaintiff "would have to walk around the desk to get to the chair, to the exam table."

and use the wall for support.  In any case, Toro requested x-rays of Plaintiff's left knee and ankle.  Plaintiff was given Motrin or Ibuprofen for the pain and he states that he requested but was not provided crutches or a wheelchair.

In her Declaration dated July 28, 2006, Toro states that she requested x-rays of Plaintiff's left knee and ankle to determine whether a skin infection from which she states Plaintiff suffered had affected the bone and developed into osteomyelitis and whether he was arthritic.  She states she did not suspect a bone fracture because Plaintiff was ambulating without difficulty and because the symptoms he presented, *i.e.*, peeling skin, discoloration and swelling, were consistent with his previous complaints relating to his skin infection and joint discomfort.  Dr. Prince likewise states in her Declaration dated July 31, 2006 that Toro "had ordered x-rays to determine arthralgia and possible osteomyelitis."  However, the Radiologic Consultation Requests prepared by Toro on August 3, 2004 contradict hers and Dr. Prince's stated reasons in July 2006 for requesting the x-rays.  Specifically, Toro states in the August 3, 2004 Requests that the reason she requested an x-ray of Plaintiff's left knee was because of a "sports injury" and that the reason she requested an x-ray of Plaintiff's left ankle was because of a "twisted ankle (sports injury)."  The Radiologic Consultation Requests do not mention arthralgia or osteomyelitis, and Dr. Prince states that she and Toro never discussed or previously ordered x-rays for arthralgia or osteomyelitis.[6]  Dr. Keever states that based on a reasonable medical certainty the x-rays were ordered because of a sports injury to rule out an ankle injury.

Dr. Prince also saw Plaintiff on August 3, 2004, the same day Toro earlier saw Plaintiff. Dr. Prince states in her July 2006 Declaration that this visit was for a diabetes care follow-up and

---

[6] In this respect, nothing in the record indicates that x-rays were ever ordered of Plaintiff's ankle and leg based merely on edema and discoloration.

that during this visit, Plaintiff had brought an interpreter.  Plaintiff states he did indeed have an

interpreter for this visit – Toro – but that Dr. Prince "kicked her out" and wouldn't allow her to

be his interpreter.  Dr. Prince states she "can't imagine that – why that would happen" because

she is "just trying to gather the information" and that an interpreter helps her understand what

the patient is trying to tell her.  Dr. Prince states she could "sometimes" communicate with

Plaintiff in English but that on other occasions Plaintiff was unable to do so, although she later

states that Plaintiff "has proven he can communicate in English when he is ready...."  For her

part, Toro states in her July 2006 Declaration that "[o]n occasions I serve as [Plaintiff's]

interpreter during his visits with the Clinical Director."  Toro does not, however, address

whether she served as Plaintiff's interpreter during the August 3, 2004 visit with Dr. Prince or

whether she attempted to serve as Plaintiff's interpreter but was not allowed to do so by Dr.

Prince.

     Certainly, Dr. Prince did not always utilize the services of an interpreter in her gathering

of information to determine what the patient was trying to tell her.  For example, with respect to

certain of Plaintiff's requests for assistance that were written in Spanish, Dr. Prince simply noted

in the section relating to the disposition of Plaintiff's request, "Cannot read Spanish," or "In

English, please," or "What [specifically?] are you requesting? Please in English."  As to why Dr.

Prince made such notations, the following colloquy occurred:

> Q. Okay. Now, is it -- why is it, Doctor, that you were not able to respond to Mr.
> Gonzalez other than to state that the disposition on, let's say 158, "in English,
> please."  Why is it that you were not able to get somebody to translate that for
> you?
>
> A.  Because Mr. Gonzalez, in the past, has been able to get people to write these
> things for him in English, and that's what I was requesting that he do, for
> expediency.  Like, if you look on page 177, there is an extensive complaint dated

September 8 2004 -- where he had assistance, I am sure -- and somebody wrote it all in English for him. All of his cop/outs prior to his accident were in English, that I remember, and so I know that he has someone available who can do this for him.  And I am asking him to do this for expediency so that I can sit down and read what he has to say.  In privacy, I would like to.  But even -- I mean, even the ones that -- he wrote one in dental in Spanish -- one in dental prior to the accident and they responded in English and he did not complain.  So everything I had before then, he was able to get someone to help him, and I was requesting based on that that he continue to do that.

Q.  Okay.  All right.  And, Dr. Prince, I want to be fair to you; so would you be fair to me?

A.  Oh.

Q.  Because I indicated I would let you talk, but I want you to answer my questions.  Okay?

A.  Okay.

Q.  My question was, was there nobody available who could have translated this for you from this inmate?

A.  It may have been, but I prefer for him to have it -- have him get someone to help him write -- as he had been doing.

Q.  So you didn't even attempt to find out what he was saying?

A.  I asked him to get it interpreted for me. That, I think, is part of his responsibility for communicating with medical staff.

Q.  I understand.  Doctor, please answer my questions.  Please.

A.  I said there might have been somebody available.  I don't know, but I requested that he get somebody to interpret it for him.

Q.  And, again, my question was, did you attempt to have anybody translate for you?

A.  Some of them, I did.

Q. Okay.  Let's talk at -- let's talk about No. 158, 00158.  This is Gonzalez Exhibit 10.

A.  Uh-huh.

Q.  Did you attempt to have anybody read that or translate that to you in Spanish?

A.  I expect I did not because I suspect -- I mean, you have to understand, Mr. DeJesus, I am very busy.  Mr. Gonzalez can come over.  He can speak to Spanish speaking people.  He has proven that he can communicate in English when he is ready, and sometimes he just needs to do that.  I am sorry.

Dr. Prince states that she didn't remember Plaintiff getting his requests translated to English becoming an issue until after he hurt his ankle and leg.  She states that before that, he didn't really complain and was very cooperative but that after the accident with his ankle and leg, it became a real issue and that Plaintiff "made no attempt to communicate with me and refused to see me on multiple occasions."[7]

Concerning the August 3, 2004 visit with Dr. Prince, Plaintiff states he showed Dr. Prince his injured foot and "[w]ith signs, I told her that it hurt," to which he states Dr. Prince replied, "okay, okay," but that Dr. Prince doesn't speak Spanish and that "she didn't understand anything that I said" and for her to allow an interpreter.  Dr. Prince reported in her note of the visit that Plaintiff reported a pain level of "0"; she did not remember seeing Toro's note of that same day wherein Plaintiff reported pain in his left ankle due to a sports injury.  Plaintiff states Dr. Prince checked his foot "but only on top" and that he "told her several times that it hurt with my poor English, I wanted to say pain in English, pain, pain," and that he didn't understand why she put a "0" on the pain assessment graph when Toro earlier that same day had recorded a pain level of "6."  Dr. Prince testified that she was only seeing Plaintiff for chronic care clinic for

---

[7] As will be seen, Dr. Prince maintained for the longest that Plaintiff's fractured ankle and leg occurred on August 26, 2004 rather than one month earlier.  Presumably, Dr. Prince is claiming that Plaintiff made no attempt to communicate with her and refused to see her on multiple occasions after August 26, 2004.  In this respect, there are in the record several "Medical Refusal Treatment" forms with respect to Plaintiff that date from 2006 and 2007.

diabetes and that "[she] did not examine his ankle for any orthopedic abnormality." She states that Plaintiff did not have any complaints about his ankle and that she only looked at his foot with reference to his diabetes and his varicose veins and ulcer. She states that Plaintiff "didn't have any tenderness when I touched him," that she "could not assess that there was any problem with his walking," and that she "didn't see anything different than what I had been seeing [prior to the sports injury] as far as skin changes and varicose veins." Plaintiff was not provided a wheel chair or crutches, nor was he provided pain medication other than the Motrin or Ibuprofen that Toro had prescribed earlier that day.

On August 17, 2004, Plaintiff was called into the Health Services Department to have his x-rays performed that Toro had ordered on August 3, 2004. The technician performed or attempted to perform an x-ray of Plaintiff's chest instead of his leg because of an incorrect treatment order from Toro that mistook Plaintiff for a former inmate of the facility, Jose Maria Gonzalez. When the technician discovered the error, he told Plaintiff he would have to reschedule an x-ray for his leg.

According to Summer Birkhead, the Diagnostic Radiologic Technologist on duty, she straightened out the mistake with Toro and placed Plaintiff on a "call out" for August 26, 2004 to which she claims Plaintiff did not show. Birkhead states she then paged Plaintiff who appeared at around 1:00 p.m. Plaintiff, however, states he came out on the "call out" for x-rays at 9:00 a.m. but that they didn't take x-rays until 1:00 p.m. and that during that time, "they sent me out to eat." In any case, Birkhead took the x-ray, suspected a fracture, and claims that because the fracture did not show completely on the x-ray of the ankle and knee that she requested authorization to x-ray the tibia-fibula, to which Dr. Prince concurred, and issued a Radiologic

Consultation Request dated August 26, 2004.

The x-ray taken on August 26, 2004 was reviewed by Dr. Prince who saw the seriousness of Plaintiff's injury.  She states that "because Ms. Toro ordered an x-ray of the left knee, that's where the fracture was of the fibula, it was at the knee and when we saw the fracture of the fibula, that's when we went ahead and ordered it all the way down and found the fracture of the ankle."  Upon discovery of the fractures, Plaintiff was placed in a wheel chair and transported to a local hospital where he was fitted with a supportive walking boot.  Plaintiff was returned to the prison on the night of August 26, 2004 and he was transported the following morning to St. Francis Hospital in Memphis, Tennessee.

On August 27, 2004, surgery was performed on Plaintiff's left leg and ankle at St. Francis Hospital by Dr. Frederick G. Wolf.  The Emergency Physician Record from St. Francis Hospital indicates that Plaintiff's injury occurred 30 days prior to admittance and the Operative Report from St. Francis Hospital indicates that the surgical procedure performed on Plaintiff was an "open reduction and internal fixation of medial malleolar fracture with closed treatment of proximal fibular fracture."  The repair required the placement of two screws in Plaintiff's left ankle.

Dr. Prince states that she initially thought Plaintiff's injury was a new fracture that had occurred on August 26, 2004, as she states in her July 2006 Declaration, but that she later changed her opinion based on "someone" who read the x-rays that noted a "callus formation" (new bone formation) on the x-rays and after reading Dr. Wolf's write-up.  Dr. Prince states she

did not read Dr. Wolf's operative report prior to preparing her July 2006 Declaration.[8]

After surgery, Plaintiff's ankle was placed in a cast and he was prescribed Lortab 1-2 p.o.q.4h as needed for pain.  Once Plaintiff was stabilized he was returned to prison that same night, close to midnight on August 27, 2004.  Plaintiff was not given the prescribed medication but, per orders of Dr. Prince, was given Tylenol #3 for the pain, 2 tablets 3 times a day as needed.

Upon his return to the prison, Plaintiff was placed in a Special Holding Unit (SHU), which Plaintiff termed the "hole" or "punishment cell."  Dr. Prince denies Plaintiff's claim that his placement in an SHU was punishment, stating that Plaintiff was placed in an SHU because while the institution has an outpatient ambulatory clinic, everything shuts down around 10:00 p.m. and in an SHU, he doesn't have to get up and walk because his toilet and bed are right there "and we bring him all of his medicines to him during the day and in the early evening."  She states that "that was just the place to put him for the first two or three days until we felt like he was able to tolerate being up on crutches or in a wheelchair."

Plaintiff disputes Dr. Prince's explanation for placing him in an SHU, noting that the medical records indicate that he was only provided pain medication twice in 12-hour intervals, and that his vital signs were not taken, he was not checked for fever, he was not catheterized or provided assistance to use the facilities, and there is no indication that he was monitored by any medical personnel.  Plaintiff states that other suitable arrangements could have been made, including allowing him to remain at St. Francis Hospital for several days or taking the time while

---

[8] Dr. Prince denies that her statement that Plaintiff's fracture was a new fracture on August 26, 2004 would have affected investigations concerning complaints Plaintiff might have issued about his treatment.  She states that prior to her July 2006 Declaration she nowhere reduced to writing her opinion that Plaintiff's fracture was new and occurred on August 26, 2004, and that her statement in her Declaration that the fracture was new was based on her memory.

he was in surgery to prepare a treatment plan and finding a suitable area at the prison for his recuperation.  Plaintiff states he suffered alone in the "hole" for three days in serious pain following the surgery.[9]

Plaintiff was in a cast for three to four weeks following surgery, no weight bearing, and then placed back in a walking boot for approximately four weeks.  The ankle thereafter was healed from the surgery and Plaintiff was allowed to place weight on it.  Plaintiff was later transferred from FCI Forrest City, Arkansas to another institution and then released from the Bureau of Prisons on November 14, 2008.  Plaintiff was thereafter repatriated to Mexico.

Plaintiff states that he experiences pain on a constant basis and that his left ankle will not support his normal day-to-day activities.  He states he can't perform his work as a mechanic or a contractor because both jobs require prolonged standing, which he states he is unable to do.  Plaintiff states that he walks in pain and sleeps in pain, that he can no longer participate in athletics, and that the left ankle doesn't have the same mobility as the right ankle.  For example, Plaintiff states that when he stumbles he is unable to recover since the ankle doesn't respond with the same reflexes as his other ankle and he thus falls down, and he states that while he can go up a ladder the problem is going down as the left foot doesn't support his body weight.  Plaintiff states the ankle is swollen and that he has to keep moving his foot forwards and backwards so that something will release from the pain.  He states he can't walk that much and that he cannot carry anything due to the pain, and that when he kneels down he struggles to get up because of the ankle.

_____

[9] Plaintiff states that after being returned to the prison close to midnight on August 27, 2004 his level of pain was "10," and Toliver noted on September 3, 2004 that Plaintiff's pain assessment was level "10."  Plaintiff states that two weeks after the surgery his pain level did go down.

Plaintiff seeks a total of $3,000,000 for the damages he claims was proximately caused by the negligence of the United States, namely the nature, extent, duration, and permanency of the injury, *see* Arkansas Model Jury Instructions Civil ("AMI Civ.") 2202, as well as damages for pain and suffering and mental anguish experienced in the past and reasonably certain to be experienced in the future.  *See* AMI Civ. 2205.  Plaintiff also seeks attorney's fees and costs.

II.

A.

In actions brought under the FTCA, courts are bound to apply the law of the state in which the acts complained of occurred.  *See, e.g., Goodman v. United States*, 2 F.3d 291, 292 (8th Cir. 1993) (citing 28 U.S.C. § 1346(b)).  Here, the acts complained of occurred in Arkansas and so it is that state's law that will be applied to Plaintiff's claims.

Pursuant to Ark. Code Ann. § 16-114-206, the plaintiff in a medical malpractice case has the burden of proving by expert testimony (1) the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or speciality in the locality in which he or she practices or in a similar locality, (2) that the medical provider failed to act in accordance with that standard, and (3) that such failure was the proximate cause of the plaintiff's injuries.  *Williamson v. Elrod*, 348 Ark. 307, 311, 72 S.W.3d 489, 492 (2002); *Reagan v. City of Piggott*, 305 Ark. 77, 79-80, 805 S.W.2d 636, 637 (1991).  In such cases, it is not enough for an expert to opine there was negligence that was the proximate cause of the alleged damages.  *Williamson*, 348 Ark. at 311, 72 S.W.3d at 492.  The opinion must be stated within a reasonable degree of medical certainty or probability.  *Id.*  Expert testimony is not per se necessary in every malpractice case, however.

13

*Haase v. Starnes*, 323 Ark. 263, 268-69, 915 S.W.2d 675, 677-78 (1996).  Rather, expert testimony is required only when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, when the applicable standard of care is not a matter of common knowledge, and when the jury must have the assistance of experts to decide the issue of negligence.  *Id.*

Magistrate Judge Volpe concluded in his Proposed Findings and Recommendations that Plaintiff would clearly need expert testimony to establish the existence of a continuing injury following the surgery and treatment to repair his fractured ankle but that an expert is not required to prove the standard of care in failing to diagnose Plaintiff's fractured ankle and, importantly, the pain suffered while awaiting a proper diagnosis and treatment.  On this point, concluded Judge Volpe, the question of negligence for failing to diagnose and treat Plaintiff's fractured ankle and liability for the pain suffered while awaiting treatment is a fact question for the trial court.  As previously noted, the Court adopted Judge Volpe's Proposed Findings and Recommendations.

B.

1.

The Court first addresses the time period following Plaintiff's injury on July 28, 2004 up to the time he finally received treatment.  On August 20, 2010, after years of vigorously contesting this action and less than two weeks before trial, the United States filed an Admission of Liability [doc.#176], admitting that it breached the applicable standard of care and is liable for the pain suffered by Plaintiff as a result of the failure to obtain an x-ray of Plaintiff's ankle

between August 3, 2004 and August 26, 2004.[10]  It is not clear why the United States waited until

just before trial to admit liability as the breach of the standard of care was clear given the nature

of Plaintiff's fractured ankle and leg and the acts and omissions that resulted in the failure to

treat Plaintiff's fractures in the four weeks prior to x-rays finally being taken.  *Cf. Owens v.*

*United States*, No. 5:04cv304-DCB-JCS, 2007 WL 1031644 at *4-5 (S.D.Miss. March 30, 2007)

(delay in taking x-rays of inmate's fractured jaw constituted breach of duty to act with ordinary

diligence in providing adequate treatment for inmate and caused inmate to endure pain for

several months).  Indeed, the failure to treat Plaintiff's fractured ankle and leg in the four weeks

prior to x-rays finally being taken is nothing less than gross negligence.[11]  The United States'

belated admission has also consumed judicial resources over the years and caused Plaintiff to

expend resources and incur expenses that he likely would not have incurred had the United

States timely admitted the obvious breach of the standard of care that occurred in this case.

Nevertheless, the Court accepts the United States' Admission of Liability.  However, rather than

August 3, 2004 being the date when the breach of the standard of care began, the Court

determines that the breach of the standard of care began on the morning of July 29, 2004, when

Plaintiff self-reported to the Health Services Department for medical care and treatment of his

ankle and leg but was turned away, and ended on the afternoon of August 26, 2004, when x-rays

---

[10] In a Supplemental Trial Brief [doc.#177] accompanying that pleading, the United States asserts that this Court affirmed Judge Volpe's dismissal of all claims "except those related to pain suffered as a result of [the Bureau of Prison's] failure to timely order an x-ray" and that "[g]iven the dismissal of all claims except the claim for suffering as a result of the delay in obtaining the x-ray and that defendant has now admitted that it breached the standard of care and is liable for pain suffered as a result of that delay, the only issue remaining for the Court's determination is the amount of damages."  Contrary to the United States' understanding of Judge Volpe's Proposed Findings and Recommendations and this Court's Order adopting same, the Court did not in any way deny or limit Plaintiff's FTCA claim but only delineated the matters for which expert testimony would be required.

[11] Dr. Keever notes that Plaintiff would have had no range of motion given the fracture of the ankle and would not have been able to put any weight on the ankle at all, and that Plaintiff had obviously suffered a traumatic injury to his foot that would be clear to a general practitioner such as Dr. Prince and which is why Toro ordered the x-rays on August 3, 2004.

were finally taken and Plaintiff was transported to a hospital.[12]

2.

Plaintiff also claims there was a breach of the standard of care for the three days following surgery when he was placed in an SHU and not given the pain medication prescribed by the surgeon but instead given Tylenol #3. The Court is unable to locate in the record where Dr. Keever opined on the standard of care concerning post-surgery facilities or whether substituting Tylenol #3 for the medication prescribed by the surgeon to address Plaintiff's post-surgical pain was a breach of the applicable standard of care. The Court determines in these circumstances that the issues of proper post-surgery facilities and proper post-surgery pain medication are not matters of common knowledge and that expert testimony was required to establish a breach of the applicable standard of care for these matters.

3.

The Court now turns to the time period following Plaintiff's surgery on August 27, 2004 and Plaintiff's claim that he suffered a continuing injury that was proximately caused by the failure to earlier obtain an x-ray of his ankle. The United States argues that Plaintiff has not met his burden of proof on his claim of a continuing injury, but Dr. Keever specifically concluded that based on a reasonable medical probability, Plaintiff has suffered permanent post-traumatic arthritis of the ankle due to his not receiving treatment for a month and that the arthritis will get worse with time. Indeed, the United States' only witness, Dr. Prince, states that she defers to orthopedists about fractures and the pain of a fracture. Considering also Plaintiff's testimony

---

[12] Having considered the record, including Plaintiff's numerous attempts to get medical attention for his injury and the pain he was in, the Court credits Plaintiff's claim that he appeared for his x-rays at 9:00 a.m. on August 26, 2004 but that x-rays were not taken until 1:00 p.m. that afternoon.

about the difficulties he continues to experience with his ankle, which Dr. Keever notes is consistent with his opinion that Plaintiff has suffered permanent post-traumatic arthritis of the ankle, the Court finds that Plaintiff has met his burden of proof that he suffered a continuing injury following his surgery on August 27, 2004 that was proximately caused by the United States' gross negligence.[13]

## C.

The Court now turns to damages, beginning first with the time period beginning on the morning of July 29, 2004, when Plaintiff self-reported to the Health Services Department for medical care and treatment of his ankle and leg but was turned away, and continuing up to the afternoon of August 26, 2004, when x-rays were finally taken of Plaintiff's ankle and leg.  The Court credits Dr. Keever's testimony that ankle fractures are a very painful fracture and on the top end of the pain scale and that if the fracture is not mobilized there is significant swelling that itself causes pain.  Plaintiff, of course, had no option of obtaining medical care elsewhere, and in light of the gross negligence of the United States during this time period, the Court finds that $10,000 per day for the pain and suffering and mental anguish Plaintiff suffered is reasonable.[14]

---

[13] In addition to his testimony at trial, Dr. Keever also submitted an Affidavit dated February 4, 2010 and a Supplemental Affidavit dated July 17, 2010.  Prior to the Court adopting Judge Volpe's Proposed Findings and Recommendations ruling on the summary judgment motion, the United States had not yet found or provided Plaintiff with the relevant x-rays.  Those x-rays only surfaced after the Order ruling on the summary judgment motion.  Upon disclosure of the x-rays, Dr. Keever supplemented his Affidavit to reflect that he has reviewed the relevant x-rays.  Although Dr. Keever did not opine in his first Affidavit that Plaintiff actually has post-traumatic arthritis of the ankle, he notes that he did not have the x-rays at that time and did not know what the fracture actually looked like.  Dr. Keever did note, however, that when a fracture such as Plaintiff's is allowed to remain displaced, there is a significant chance of damage to the weight bearing surface of the joint, leading to post-traumatic arthritis.  Keever Aff. at ¶ 15(3).  Dr. Keever states that with the additional information he has learned it is his opinion that Plaintiff does indeed have post-traumatic arthritis of the ankle.  Following Dr. Keever's first Affidavit, the United States moved to strike expert testimony, which the Court denied by Order dated February 24, 2010 [doc.#154].

[14] Plaintiff submitted to the Court a "Demand for Damages Under the Federal Tort Claims Act" in which he states he seeks "at least" $10,000 per day in damages for the time period of July 28, 2004 to August 3, 2004, and "at least" $5,000 per day in damages for the time period of August 3, 2004 to August 26, 2004.  *See* Pl.'s Demand for Damages Under the Federal Tort Claims Act at 4, 8, 10 (emphasis in original).  Given the gross negligence of the United States in this case and its effect on Plaintiff, the Court determines that $10,000 per day in damages for the entire period beginning on the morning of July 29, 2004

Accordingly, for the time period beginning on the morning of July 29, 2004 and continuing through August 25, 2004 (28 total days), the Court awards Plaintiff $10,000 per day.  For the morning of August 26, 2004, prior to the x-rays being taken that afternoon, the Court awards Plaintiff $5,000.  Plaintiff is thus awarded $285,000 for the pain and suffering and mental anguish he suffered from the morning of July 29, 2004 up to the afternoon of August 26, 2004.

With respect to the permanent post-traumatic arthritis of Plaintiff's left ankle that was caused by the United States' gross negligence and will get worse with time, Plaintiff is currently 54 years old (having been born on February 28, 1956), and under the mortality table set forth in Ark. Code Ann. § 18-2-105, Plaintiff has a life expectancy of another 26.80 years.  However, given Plaintiff's medical issues unrelated to his ankle, including diabetes, the Court will assume that Plaintiff has a life expectancy of another 22 years rather than the 25 years suggested by Plaintiff in his damages brief and the 26.80 years suggested by the mortality table.  *See* AMI Civ. 2219 (mortality tables may be considered in connection with other evidence relating to the life expectancy of an individual, including evidence of his or her occupation, health, habits, and other activities, bearing in mind that some persons live longer than the average and some persons less than the average).  *Cf. Oxford v. Hamilton*, 297 Ark. 512, 515, 763 S.W.2d 83, 85 (1989) (evidence of the appellant's habits – including use of alcohol and its damaging effects on body's organs – was useful and even necessary to assist the jury in determining life expectancy).  Considering the nature, extent, and permanency of Plaintiff's injury, and the pain and suffering and mental anguish reasonably certain to be experienced in the future, the Court agrees with Plaintiff that $2,000 per month for the duration of his expected lifetime – which the Court

---

and up to the afternoon of August 26, 2004 is reasonable.

determines to be 22 years – is reasonable, for a total of $528,000.[15]

III.

Finally, the Court turns to Plaintiff's motion for attorney's fees and costs [doc.#192]. Plaintiff recognizes that ordinarily, an award of attorney's fees with respect to his FTCA claim must be taken from the judgment awarded pursuant to the bench trial and are limited to 25% of the judgment.  *See, e.g., Dockery v. United States,* 663 F.Supp.2d 111, 126 (N.D.N.Y. 2009) (citing 28 U.S.C. §§ 2412(d)(1)(A), 2678).  Rather, Plaintiff seeks attorney's fees and costs under Rule 56(g) of the Federal Rules of Civil Procedure on grounds that on January 6, 2010, the United States caused to be filed a bad faith motion for summary judgment [doc.#128] founded on false and misleading declarations made by medical personnel who were employed by the United States at the time such declarations were made and that this bad faith motion resulted in the loss of his *Bivens* claim.  Plaintiff argues that these declarations needlessly increased the cost and length of this litigation and he accordingly seeks $50,180 in attorney's fees and costs in the amount of $26,411.49 in prosecuting the *Bivens* claim that he states was lost through the bad faith summary judgment motion.

The Court agrees with Plaintiff that certain representations of Toro and Dr. Prince in their July 2006 Declarations could be considered evidence of bad faith.  These representations include Toro and Dr. Prince blatantly misrepresenting the reasons that x-rays were requested on August 3, 2004, Dr. Prince's questionable assertion that Plaintiff's fracture was a fresh fracture on August 26, 2004 rather than one that occurred one month earlier, and Toro's and Dr. Prince's equally questionable assertions that Plaintiff was walking with no difficulty during the time

---

[15] Damages for future pain and suffering are not reduced to present value.  *See* Comment to AMI Civ. 2205.

19

period at issue.  In this respect, given the nature of Plaintiff's fractured ankle and leg and Dr.

Keever's opinion that Plaintiff would not have been able to put any weight on the ankle at all,

Toro's and Dr. Prince's assertions that Plaintiff was walking with no difficulty raise many

questions.

Nevertheless, "[c]ase law makes clear that no sanctions will be imposed under Rule 56(g)

unless the court relies on the false affidavit in ruling on the summary judgment motion."

*Structural Polymer Group, Ltd. v. Zoltek Corp.*, No. 4:05cv321 CEJ, 2006 WL 2802202 at *2

(E.D.Mo. Sept. 25, 2006) (collecting cases).  *See also Jaisan, Inc. v. Sullivan*, 178 F.R.D. 412,

416-417 (S.D.N.Y. 1998) (discussing cases denying Rule 56(g) motions where a litigant's

actions, even though wrongful, did not affect the disposition of the summary judgment motion

and concluding that plaintiff's conduct "even if it were 'egregious' as defined under that case

law, it did not affect the outcome of the case and Rule 56(g) sanctions would be inappropriate for

that reason"); *Sutton v. U.S. Small Business Administration*, 92 Fed.Appx. 112, 117-118 (6th Cir.

2003) (district court did not rely on affidavit in granting defendant's summary judgment motion

and, thus, the affidavit, even if submitted in bad faith, did not prejudice plaintiffs).  Here,

defendants did not attach Toro's and Dr. Prince's July 2006 Declarations to their motion for

summary judgment and they did not otherwise reference those Declarations in their arguments

on Plaintiff's *Bivens* claim.  Rather, defendants' motion for summary judgment on Plaintiff's

*Bivens* claim was predicated on the fact that Toro's error in misidentifying the inmate on the

Radiological Consultation Request thereby delaying the taking of x-rays of Plaintiff's ankle and

leg amounted only to negligence,[16] that Plaintiff did not at that time have an expert witness for his claim that the delay in treatment of his fractured ankle resulted in permanent injury that he otherwise would not have incurred, and that Warden Linda Sanders and Dr. Prince were named as defendants solely because of their supervisory position as Warden and Clinical Director.[17]  In his response [doc.#133] to defendants' motion for summary judgment, Plaintiff did not address his *Bivens* claim but focused on his FTCA claim, and Judge Volpe's Proposed Findings and Recommendations do not reference any of the matters that could be considered evidence of bad faith, Judge Volpe having not been presented with such matters.[18]  Accordingly, because the July 2006 Declarations of Toro and Dr. Prince (or any other possible instances of bad faith) did not at any time play a factor in the summary judgment proceedings on Plaintiff's *Bivens* claim, the Court must deny Plaintiff's Rule 56(g) motion for attorney's fees and costs.  *Cf. Havrum v. United States*, 204 F.3d 815, 819 (8th Cir. 2000) (in addressing request for attorney's fees under Equal Access to Justice Act for bad-faith activity of the government in FTCA case, and

---

[16] On this point, Plaintiff's Second Amended Complaint alleges with respect to his *Bivens* claim that the mistake in his identity was caused by Toro's negligence in completing the Radiological Consultation Request.  2nd Am. Compl. at ¶¶ 17-18 [doc.#86].  Negligence claims, however, are not cognizable under *Bivens. See, e.g., Sellers by and Through Sellers v. Baer*, 28 F.3d 895, 902-03 (8th Cir. 1994) (even gross negligence on the part of federal officials is not actionable under *Bivens*).

[17] On this point, Plaintiff's Second Amended Complaint alleges with respect to his *Bivens* claim that Linda Sanders is the Warden for the FCI and that Dr. Prince is the Clinical Director for the FCI and that these individuals, by virtue of their positions, are responsible for ensuring that the departments and personnel within the prison perform their duties in accordance with proper procedures and the laws of the United States.  2nd Am. Compl. at ¶¶ 35-36.  These allegations clearly assert respondeat superior liability, which is not cognizable in a *Bivens* action.  *Bonner v. Outlaw*, 552 F.3d 673, 678-79 (8th Cir. 2009).  The Court notes that it is not clear why the United States moved for summary judgment on Plaintiff's *Bivens* claim with respect to Warden Sanders as she was earlier dismissed as a defendant on respondeat superior grounds by Order entered August 19, 2008 [doc.#100] adopting, without objections, Magistrate Judge Jerry W. Cavaneau's Proposed Findings and Recommendations [doc.#99] (prior to the case being reassigned to Judge Volpe).  The defendants listed in the above caption, which does not include Warden Sanders, are those that remained following the Court's August 19, 2008 Order.

[18] Toro's and Dr. Prince's July 2006 Declarations *were* submitted with a previous summary judgment motion filed on August 1, 2006 when this action was still assigned to Magistrate Judge Cavaneau.  Judge Cavaneau, however, issued Proposed Findings and Recommendations [doc.#71] in which he recommended *inter alia* that Plaintiff's *Bivens* claim, rather than being disposed of on summary judgment, be allowed to proceed.  By Order dated March 26, 2007 [doc.#81], this Court adopted Judge Cavaneau's Proposed Findings and Recommendations.

assuming without deciding that such fees are available in FTCA actions, Court held that "[f]ees for bad-faith activity on the government's part are available only in exceptional circumstances ... and we think that cases in which the activity complained of had no substantial effect on the plaintiff's litigation efforts necessarily fall outside that category").[19]

IV.

For the foregoing reasons, the Court awards Plaintiff a total of $813,000 in compensatory damages on his FTCA claim and denies Plaintiff's motion for attorney's fees and costs under Rule 56(g) of the Federal Rules of Civil Procedure [doc.#192].[20]

IT IS SO ORDERED this 15th day of October, 2010.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE

---

[19] As previously noted, however, attorney's fees with respect to Plaintiff's FTCA claim may be taken from the judgment awarded pursuant to the bench trial in an amount up to 25% of the judgment.  Concerning Plaintiff's request for costs, Rule 54(d) of the Federal Rules of Civil Procedure gives district courts the power to tax costs in favor of a prevailing party. *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 601 (8th Cir. 2009).  These awards, however, must fit within 28 U.S.C. § 1920, which enumerates the costs that a district court may tax.  *Id.*  Plaintiff, however, does not seek costs under Rule 54(d) and 28 U.S.C. § 1920, but only seeks costs under Rule 56(g) as a sanction for prosecuting the lost *Bivens* claim, which the Court today denies.  The Court notes that of the $26,411.49 Plaintiff seeks in costs, the vast majority of that amount – $22,789.25 – was for the cost of his expert witness, Dr. Keever.  Even had Plaintiff moved for costs under Rule 54(d) and 28 U.S.C. § 1920, Dr. Keever was not Court appointed.  Accordingly, under 28 U.S.C. §§ 1920(3) and 1821(b), Plaintiff would not be entitled to the $22,789.25 he seeks for the cost of his expert witness but would only be entitled to an award of witness fees in the amount of $80.00 and related expenses for Dr. Keever's attendance at trial for the two days.  *See, e.g., Hull by Hull v. United States*, 978 F.2d 570, 572-573 (10th Cir. 1992) (citing *Crawford Fitting Co. v. J.T. Gibbons*, 482 U.S. 437 (1987)); *Martino v. United States*, No. Civ.95-748 (JRT/RLE), 2002 WL 459069 at *2 (D.Minn. March 20, 2002).

[20] Judge Volpe's Proposed Findings and Recommendations which recommended granting the United States' motion for summary judgment on Plaintiff's *Bivens* claim was issued without benefit of a transcript of Plaintiff's deposition, Dr. Keever's expert opinion, and the relevant x-rays.  In addition, Judge Volpe was not presented with Toro's and Dr. Prince's July 2006 Declarations.  Should the record in this case be reopened, the Court, in light of the evidence adduced at trial that would possibly support a finding of deliberate indifference to Plaintiff's serious medical needs, will consider revisiting the grant of summary judgment on Plaintiff's *Bivens* claim to the extent that he is alleging more than negligence and respondeat superior liability.  *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (interpreting deliberate indifference standard).